Eva Angevine *vs.* Rachel S. Hewitson & another.

Suffolk. November 19, 1919. — February 28, 1920.

Present: Rugg, C. J., Braley, De Courcy, Pierce, & Jenney, JJ.

*Landlord and Tenant,* Liability of landlord to member of tenant's family. *Negligence,* Of one in control of real estate. *Evidence,* Competency.

The landlord of an apartment house is not liable to a child of a tenant for personal injuries caused by his falling through a defective gate into an unused dumb-waiter well around which was built a stairway used in common by the tenants of the house, if it appears that the defect in the gate existed when the tenancy began and that its existence was not known to the landlord. De Courcy, J., dissenting.

In an action by the child, who received injuries as described above, against the landlord, evidence of regulations of the board of elevator regulations, which specifically provided that they did not relate to dumb-waiters, were *held* improperly to have been admitted in evidence.

Tort for personal injuries received from falling down the elevator shaft of a dumb-waiter in the back hallway of an apartment house owned and controlled by the defendants. Writ dated June 6, 1918.

In the Superior Court the action was tried before *Morton,* J. The material evidence is described in the opinion. The judge ordered a verdict for the defendants and reported the case for determination by this court, it being stipulated that judgment should be entered on the verdict if his ruling was right, and, if the case should have been submitted to the jury, judgment should be entered for the plaintiff in the sum of $500.

*W. S. Pinkham,* (*F. E. Litchfield* with him,) for the defendants.
*W. P. Murray,* for the plaintiff.

Pierce, J. This is an action of tort to recover damages for physical injuries sustained by the plaintiff on May 2, 1918, and caused by falling down a dumb-waiter well in a hallway used by tenants of the defendant Rachel S. Hewitson, the control thereof remaining in the landlord. At the close of the evidence before a jury, the presiding judge on motion ordered a verdict for the defendants, with the stipulation that final judgment is to be entered for both the defendants on the verdict if the ruling and

direction was right; but if the case should have been submitted to the jury, judgment is to be entered for the plaintiff in the sum of $500.

The material facts in support of the plaintiff's case in substance are as follows: The house was an old house, probably forty years old; was a three-flat house, being one half of a six-apartment building. The apartment on the second floor was hired by the father of the minor plaintiff, who did not examine it before it was hired on his behalf by his wife. The family moved in on April 17, 1918, and moved out on July 1, 1918. There is a front hall and stairs and a back hall and stairs running to each of the three apartments, the back hall and stairs being used in common by all the tenants of the house. Within the stairway in the back hall, opposite the kitchen door, there was a dumb-waiter shaft with the stairs running round it. There were places for the dumb-waiter to stop at each floor. It was not in use during the tenancy of the father,—the rope was cut and it rested at the bottom of the shaft. The shaft consisted of the space between upright posts, with a removable gate running between guides on the posts at each floor. "The way of using the dumb-waiter was to lift the gate out and run the dumb-waiter up and down and then replace the gate between the guides." An inspector of the building department of the city of Boston, examined the dumb-waiter shaft on May 15, 1918. In substance he testified that the plaintiff fell from the floor to the top of the car and thence to the basement floor, twenty-two feet; that the opening at the second floor was twenty-six inches wide; that the gate was two feet and six inches high; that it was set in guides; that there was nothing to indicate that there had been any change in the elevator well or gates since the house was built; "that the gate apparently was strong and the supports were strong and no trouble with the way it was built or defect in any way."

The father of the plaintiff testified that he was a carpenter; that he did not examine the premises before hiring them and "his attention was not called to the gate at any time before the accident;" that after the accident he examined the gate, the guides and posts, and then made a sketch to a scale which was produced in court, and is before the full court on the report. In detail the sketch shows, and the witness testified, that the two posts which formed the well were three and three fourths by three and three fourths.

inches square; that they were made of hard pine and ran from the cellar to the roof, straight up and down, twenty-four inches apart measuring on the inside; that there were cleats attached to the posts which were three eighths by three fourths of an inch, nailed to the posts the three eighths way; that the tongue of the gate was three eighths of an inch from the end of the bar, and the edge of the little tongue was bevelled a little; that the gate was twenty-three and eleven sixteenths inches measured across from tenon to tenon, that is five sixteenths of an inch short of two feet, giving one sixteenth of an inch bearing against the cleat; that the gate was painted over, but was probably made of hard pine; that he measured the gate at the bottom as well as the top, and that it was square and the same width top and bottom, and that there was only one sixteenth of an inch bearing against the cleats which formed the guides; that part of this one sixteenth was taken up by the bevel; that you could just put your hand against the gate and push it in or out, either one; that the gate did not set steadily in the guides, but rattled; that there was five sixteenths of an inch play between the gate and the guides; and that there was no change in condition of the gate and dumb-waiter shaft between the beginning of tenancy and the accident.

The plaintiff testified that "she will be ten years old on the third day of July, 1919; that she lived on the second floor of the building, 59 Monadnock Street, in 1918, and was hurt on the second day of May of that year about four o'clock in the afternoon; that just before the accident she came up the back stairs with another little girl . . . and went into the apartment of her father and brought out two balls, and that she was giving one of these to Bessie when it dropped and rolled over near the elevator well, and that in picking it up she leaned against the gate and fell down the elevator well."

There was further evidence corroborating the testimony of the father, inspector and plaintiff.

Against the exception of the defendants, the presiding judge admitted in evidence subsection *f* of section 75, division C of the Board of Elevator Regulations, which reads: "Gates are to be made of metal or of hard wood, and are to be strong and rigid and so constructed and installed that they cannot be sprung from their guides. Bar gates hinged at one end shall be of such design

and construction as to insure their accurate closing and their rigid support when closed." The evidence should have been excluded. Section 75, subsections *a, b, c* and *d,* deals with landing gates in general and with landing gates used in connection with the special forms of elevators described in the subsections; dumb-waiter elevators are excepted in terms. And subsection *f,* which defines the form, design and construction of the gates referred to in subsections *a, b, c* and *d,* is not applicable to the form of elevator at the place of the accident.

In this Commonwealth it is settled that guests and members of the family of a lessee have no greater rights in tort against the landlord than the lessee to recover damages for injuries caused by a defective condition of the leased premises or the premises connected therewith. *Woods* v. *Naumkeag Steam Cotton Co.* 134 Mass. 357. *Bowe* v. *Hunking,* 135 Mass. 380. It is plain that the lessee, the father, took the premises with its hallways and stairways in the condition they were or appeared to be in at the time of the letting, unless the defects complained of were hidden, were in the nature of a trap, were known to the landlord, and were unknown to the lessee. *Cutter* v. *Hamlen,* 147 Mass. 471. *Martin* v. *Richards,* 155 Mass. 381, 386. *O'Malley* v. *Twenty-Five Associates,* 178 Mass. 555. There is no evidence that the landlord in fact knew that the gate was defective in the respect complained of and it is plain that he could not have informed or warned the lessee of any fact or facts in connection with the construction or adjustment of the gate that were not readily discoverable by a person of the lessee's experience and skill in carpentry. *Martin* v. *Richards, supra,* page 382. In the opinion of a majority of the court, it follows that the landlord in the case at bar owed no duty to the lessee or to the plaintiff to make the premises safer than they were at the time of letting, or to warn them or either of them of dangers which were then discoverable by the lessee.

By the terms of the stipulation, "final judgment is to be entered for both the defendants."

*So ordered.*

DE COURCY, J. I am unable to agree to the opinion of the majority of the court, and think it proper to express the reasons for my dissent. The plaintiff's parents on April 17, 1918, hired the apartment on the second floor of the defendants' tenement

house. The back stairs, used by all the tenants, wound around a dumb-waiter shaft or well; but the lift had been disconnected and was at the bottom of the shaft. The well consisted of the space between four upright posts. There was a painted gate at the edge of the back hall, a little less than two feet in width, constructed to run between guides attached to the posts. On May 2, 1918, the plaintiff, a child eight years of age, came from her apartment into the back hall; a ball dropped from her hand and rolled over near the dumb-waiter shaft; in picking it up she leaned against the gate, and fell with the gate to the bottom of the well, a distance of twenty-two feet. Her due care is undisputed. The main issue is whether there was evidence entitling her to go to the jury on the question of the defendants' negligence.

Admittedly this common hallway and gate were in the control of the defendants. The duty they owed to the plaintiff, who was a member of a tenant's family, was "that of due care to keep it [the gate] in such condition as it was in, or purported to be in, at the time of the letting." *Quinn* v. *Perham*, 151 Mass. 162, 163. This phrase was defined in *Andrews* v. *Williamson*, 193 Mass. 92, 94, as meaning "such condition as it would appear to be to a person of ordinary observation, and has reference to the obvious condition of things existing at the time of the letting." In the same opinion, Hammond, J., in dealing with the charge given by the judge of the Superior Court said, ". . . the fair construction of it upon this point is that, if the defect of which the plaintiffs complain was obvious at the time of the letting, then the defendant was not liable; but that if the steps appeared strong and safe at the time of the letting then the defendant was bound to use due care to keep them in the condition in which they thus appeared to be. As thus construed the charge was apt and correct." In the recent case of *Draper* v. *Cotting*, 231 Mass. 51, 60, the opinion quoted with approval the following language in the charge of the trial judge: "But, if the elevators were apparently safe at the time a particular tenant took occupancy, then the landlord assumed the duty of keeping the elevators not only apparently safe, but actually safe during the course of that tenant's occupancy; and it would be no defence to the landlord if as a matter of fact the elevators were defective and dangerous by reason of the landlord's negligence, to say that the elevators at the time when an accident occurred by

reason of which liability was sought to be attached to the landlord, were in the same condition at the beginning of the tenant's occupancy. If they were apparently safe when the tenant began occupancy, the landlord must use reasonable care to keep them safe; and, if they were in fact unsafe at the time when they were apparently safe, it was the landlord's duty nevertheless during the occupancy of the particular tenant to put them in a safe condition and to use reasonable care to keep them so. . . . The tenant has a right to rely on the conditions as they were apparently." Among other recent cases in which this responsibility of the landlord for the safe condition of common stairways and halls is referred to in similar language may be mentioned *Domenicis* v. *Fleisher,* 195 Mass. 281, 283, *Shannon* v. *Willard,* 201 Mass. 377, 381, *Ward* v. *Blouin,* 210 Mass. 140, 143, *Green* v. *Pearlstein,* 213 Mass. 360, 362, *Noonan* v. *O'Hearn,* 216 Mass. 583, 586, *Shea* v. *McEvoy,* 220 Mass. 239, 242, *Gallagher* v. *Murphy,* 221 Mass. 363, 365, *Oles* v. *Dubinsky,* 231 Mass. 447, 448, *Crudo* v. *Milton,* 233 Mass. 229, 231.

I dwell on this familiar rule because it seems to me that the opinion in effect limits the duty of the landlords to keeping the common hallway and gate in the same condition as in fact they were in at the time of the letting. But if the gate (which served as a railing or guard to the well) then appeared to be in a safe condition, when in fact it was in a defective and unsafe condition, and the hallway was thereby rendered dangerous for the use intended, it was the duty of the defendants to put and maintain the gate in that safe condition in which it purported or appeared to be. The landlords cannot escape liability by remaining in ignorance of its unsafe and defective condition. They, and not the tenant, were in control of the gate, and responsible for its condition. The duty was on them to make such examination as would disclose whether in reality it was as safe and secure as it appeared to be, and to remedy any defect that was not obvious. *Cussen* v. *Weeks,* 232 Mass. 563, 566. As was said in *Lindsey* v. *Leighton,* 150 Mass. 285, 288, "It was not necessary to show that the defendant had actual knowledge of the defect. His duty was that of due care; and ignorance of the defect was no defence." See also *Leydecker* v. *Brintnall,* 158 Mass. 292. And it is immaterial that the plaintiff's father was a carpenter. Manifestly any assumption of risk by him cannot be imputed to this plaintiff.

Accordingly the issue of the defendants' negligence involved only these two questions: first, would the. appearance of this gate indicate to a reasonably prudent tenant that it was safe for the use for which it then was intended, — namely as a guard to protect those using the hallway from falling into the well? Second, was the gate as safe in fact as it was in appearance? As to the first, there was the testimony of Mrs. Angevine that she noticed the gate the day after she moved in, and supposed it was all right. Mrs. Jennings, a tenant, testified that as you looked at the elevator gate "it looked to be pretty . . . yes, it looked strong." And the elevator inspector, Addison, said that "the gate apparently was strong and the supports were strong and no trouble with the way it was built or defect in any way." On this evidence the jury could say that the gate was apparently safe. As to the second question, the jury could find that this appearance of safety was superficial and deceptive. The gate was so installed as to be held in place by guide strips, nailed to the posts on both sides of the opening. These strips or cleats were three eighths by three fourths of an inch in thickness. There was only one sixteenth of an inch bearing against the cleats which formed the guides, — and part of this one sixteenth was taken up by the bevel of the tongue of the gate. There was five sixteenths of an inch play between the gate and guides. The fact that the tongue of the gate extended only one sixteenth of an inch into the space between the guide cleats was not apparent, because this shortness was concealed by the cleats. As matter of fact, a slight push would cause the gate to be sprung from its position between the guides, — as happened at the time of the accident. In short, there was evidence for the jury that this apparently safe gate or barrier at the edge of the well was in fact treacherously dangerous, a trap to those using the hallway; and that this improper and unsafe condition could have been discovered and remedied before the accident by the exercise of reasonable care on the part of the defendants, who were charged with the duty of keeping this common hallway safe for their tenants.

In my opinion the case should have been submitted to the jury. *Wilcox* v. *Zane,* 167 Mass. 302. *Coupe* v. *Platt,* 172 Mass. 458. *Grella* v. *Lewis Wharf Co.* 211 Mass. 54. *Maionica* v. *Piscopo,* 217 Mass. 324. *Loucks* v. *Dolan,* 211 N. Y. 237. *Mesher* v. *Osborne,* 48 L. R. A. (N. S.) 920, note.